IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

CHARLOTTE WILKERSON,

     Plaintiff,

v.                        Case No. 2:06-cv-00866

CHARLESTON POLICE DEPARTMENT,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is a civil rights case filed by the *pro se* plaintiff, Charlotte Wilkerson, relating to Plaintiff's arrest during a visit to Charleston, West Virginia, by then Vice President Richard Cheney. After extended proceedings, the Charleston Police Department is the only remaining Defendant.

Pending before the court is a Motion for Summary Judgment filed by the Charleston Police Department ("CPD") on December 22, 2008 (docket no. 56). Plaintiff has responded (docket no. 62), and CPD has replied (docket no. 64).

## PROCEDURAL HISTORY

On October 11, 2006, Plaintiff filed a hand-written Complaint (docket no. 2), which alleges, in pertinent part, as follows:

> Charlotte Wilkerson vs. Charleston Police Department
> Complaint: Failure to maintain crowd control, denial of medical treatment on location while under duress and stress, failure to demonstrate proper training while

1

dealing with uncontrollable crowd and heart attack patient, unlawful detainment, unlawful search and seizure, denial of 1st amendment; excessive force, spreading hearsay instead of conducting proper investigation to get the factual events, and right to freely assemble.

(Docket no. 2 at 1.)

After a delay in serving CPD, on October 4, 2007, CPD filed a Motion for More Definite Statement (docket no. 31). On November 2, 2007, Plaintiff responded to CPD's Motion for More Definite Statement with the following statement:

Comes now Plaintiff, Charlotte Wilkerson pursuant to Rule 12(e) of the Federal Rules of Civil Procedure and moves this court to order relief granted to me by The City of Charleston for the police misconduct and negligence of the Charleston Police Department. I, hereby, ask this court to grant me relief for punitive damages in the amount of $250,000 for their failure to execute my arrest properly, failure to investigate thoroughly, to act professionally and execute the law as the oath they took requires them to uphold, and purporting to the media to be informed about events that, apparently, they either had been ill advised or had failed to investigate properly.

(Docket no. 37.)

Then on December 4, 2007, Plaintiff filed a document entitled "City of Charleston is guilty of civil rights violation" (docket no. 39), which states:

<u>City of Charleston is Guilty of Civil Rights Violations</u>
The City of Charleston violated my rights under 42 U.S.C. §1983 *(Carroll K. V. Fayette County Bd of Educ., 19 F.Supp. 2d 618 (S.D.W.Va. 1998)*. For relief, I petition this court to award me punitive damages in the amount of $50,000 for mental anguish and cruelty.

(Docket no. 39.) The court granted CPD's Motion for More Definite

Statement and directed Plaintiff to file a statement specifying with particularity the time, place, and source of any act, failure to act, and/or statement which she contends gives rise to her claim against CPD and stating generally all other circumstances underlying her claim against CPD (docket no. 42).

On May 20, 2008, Plaintiff provided a Definitive Statement of her Arrest of October 18, 2004 (docket no. 45), in which she states [verbatim]:

> Now comes Charlotte Wilkerson for the second time submitting a complaint per Rule 8 8 (a): Fed.R.Civ.P. that on October 18, 2004 in the City of Charleston situated on Washington Street approximately three blocks from "The Grill" restaurant, established in the state of West Virginia, constituted by judicial law to be within the boundary of the Southern District for filing federal civil suits was arrested at 10:30 a.m. by the Charleston Police Department's Detective Eggleston.
>
> As a bystander observing several political protest, I was approached by Detective Eggleston and a FBI Agent. I was asked to give an account of my presence; specifically, "was I previously in the "Grill" restaurant. I informed them that, peradventure I was in the "Grill" 10-15 minute prior by mistake. I was asked my name, which I gave; and asked to see my ID. I assured them that I was Charlotte Wilkerson and informed them that I was enroute to my job and had to be going. However, I was denied freedom to leave. Consequently, I was handcuffed, arrested, and put into a police car. Upon arrival to the Charleston police station I was booked, fingerprinted and charged with carrying a concealed weapon, obstructing an officer, and unlawful misconduct.
>
> I hereby request that this court grant me judgment for the relief in the amount of $750,000 from the City of Charleston for the police misconduct of the Charleston Police Department. Also for violating my constitutional rights afforded me under the Constitution of the United States: encompassing but not limited to: I, IV, V, VIII, IX, and XIV Amendments.

(Docket no. 45 at 1-2.)

On May 28, 2008, CPD filed an Answer (docket no. 47) to the Complaint (docket no. 2) and Plaintiff's Definite Statement of her Arrest of October 18, 2004 (docket no. 45).

On December 22, 2008, CPD filed a Motion for Summary Judgment (docket no. 56) and a Memorandum in support (docket no. 57).  On January 7, 2009, the undersigned issued a Roseboro[1] notice to Plaintiff (docket no. 58), and on January 13, 2009, Plaintiff responded to CPD's Motion for Summary Judgement (docket no. 62). On January 21, 2009, CPD filed its reply (docket no. 64).

It is noted that in CPD's reply to Plaintiff's Response, it states Plaintiff has not offered any evidence to rebut CPD's statement of fact that

> she did not have permission from anyone to enter an area that was, painfully obviously (sic) to anyone, a restricted area.  The City is, of course, well aware that Ms. Wilkerson appears *pro se*, as she reminds us in her motion.  But that fact does not give her license to break the rules or cite cases that have absolutely nothing to do with the pending motion... Furthermore, the Court has warned Ms. Wilkerson in its Roseboro notice to her that she "must set out, either in her own affidavit or sworn statement or the affidavits or sworn statements of other witnesses, specific facts that show that the plaintiff and the defendants actually disagree about one or more important facts present in this case" (Dkt. #58) and that she "should address, as clearly as possible, the issues and facts stated in the Complaint and in the affidavits submitted by the defendant" (*id.*).   Nonetheless, she chose not to do so in her response.

(Docket no. 64 at 2.)

---

[1] Roseboro v. Garrison,  528 F.2d 309 (4th Cir. 1975).

4

## 42 U.S.C. § 1983

Section 1983 states:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory
> or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken
> in such officer's judicial capacity, injunctive relief
> shall not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable.  For the
> purposes of this section, any Act of Congress applicable
> exclusively to the District of Columbia shall be
> considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  Thus, the question before this court is whether

the conduct of CPD deprived Plaintiff of any right, privilege or

immunity secured by the Constitution or laws of the United States.

### SUMMARY JUDGMENT STANDARD

In evaluating summary judgment motions, Rule 56 of the Federal

Rules of Civil Procedure provides:

> The judgment sought should be rendered if the pleadings,
> the discovery and disclosure materials on file, and any
> affidavits, show that there is no genuine issue as to any
> material fact and that the movant is entitled to judgment
> as a matter of law.

Fed. R. Civ. P. 56(c) (2007).

Material facts are those necessary to establish the elements

of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A genuine issue of material fact exists if,

in viewing the record and all reasonable inferences drawn therefrom

5

in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.

The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Id. at 322-23. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

> [A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in

his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

### STATEMENT OF UNDISPUTED FACTS

Defendant took Plaintiff's deposition on November 3, 2008 (docket no. 56-2).  The facts set forth below are taken directly from her deposition and taken as true for the purpose of considering the motion for summary judgment.

On October 18, 2004, Vice President Richard Cheney held a private, invitation-only event at The Grill, a restaurant in Charleston, West Virginia (id. at 14).  Plaintiff, who at the time was a volunteer for Senator John Kerry's campaign (id. at 17), asserted that she thought that the function was a town meeting open to the public (id. at 15).  However, when she arrived, she realized the event was not open to the public because the restaurant entrance had a tape barrier (id. at 19-20).

Plaintiff stated that she then "assumed there had to be another entrance point into The Grill because of the set up... So I just proceeded to walk around back to see what was going on back there" (id. at 22-23).  There she saw three CPD officers standing beside three patrol cars (id. at 25-26), she spoke to one of the officers before entering the back entrance of The Grill (id. at

7

26).  Upon entering the restaurant, Plaintiff was asked by a woman in business attire about her name and then questioned regarding whether she had an invitation.  Plaintiff testified that she gave her name and responded that she did not have an invitation (id. at 28). Plaintiff was then told that it was "invitation only" and that she had to leave (id.).

Plaintiff stated that she left the restaurant, without protest (id.).  Plaintiff then went "back to the front of The Grill... I was just standing there watching, you know, the political battle going on between the protesters" (id. at 31-32).  Plaintiff testified that she was soon approached by CPD Officer Eggleston and an unnamed Secret Service agent and asked "Were you in The Grill?" to which she responded that she had been "about 10 to 15 minutes ago" (id. at 32-33).

Officer Eggleston then asked Plaintiff her name, which she stated, and for identification, which she refused to produce (id. at 34-35).  Plaintiff then walked away, and Officer Eggleston "politely" followed her (id. at 35, 39).  Part of the crowd began to follow them and shout, Plaintiff then "proceeded to run" (id. at 39-40).  Officer Eggleston followed Plaintiff, caught her, and handcuffed her (id. at 41).

Plaintiff stated that she was not hurt during the arrest but that she did experience an accelerated heart rate (id. at 41). Plaintiff stated she had a preexisting heart condition known as

8

superventricular tachycardia ("SVT"), which she described as "basically when I get nervous, my breathing began to get heavier and my oxygen was circumvented and my heart rate began to accelerate" (id. at 42). Plaintiff stated that SVT causes her speech to slur, causes her to look "inebriated," and "not talk in rational terms" (id. at 43). Plaintiff stated that Officer Eggleston was "concerned" (id. at 46) about her condition and repeatedly asked about her well being (id. at 47). Plaintiff was then placed in a patrol car (id. at 49).

When she was booked downtown, Plaintiff asserts that an officer was curt with her but acknowledges "I remember being resistant because I was scared" (id. at 53). Plaintiff stated that Officer Eggleston had called an ambulance at the scene, and that it met them at the police station (id. at 54). When asked if she wanted to go to the hospital, she responded "no, I didn't want to go" (id. at 54). Plaintiff stated that "as soon as I stepped my foot across the threshold door at the police station, my heart rate dropped... Which was a good thing" (id. at 55). Plaintiff stated that the emergency medical technicians ("EMTs") checked her heart rate and it was normal (id. at 56).

Plaintiff was then interviewed at the police station by Officer Eggleston and the Secret Service (id. at 57). Plaintiff described her interviewers as "very calm and professional." (Id. at 58.) Plaintiff stated that her purse had been examined and a

boxcutter found, which the interviewers explained to her was considered a concealed weapon (id. at 59).  Plaintiff stated that she was unaware that it was considered a concealed weapon (id. at 59).

Plaintiff was arraigned before a magistrate and the charges were dropped the next day (id. at 60).  Plaintiff stated that she was pleased with the result and that "it was all just a big, you know... [m]isunderstanding" (id. at 60).  When asked "you understand why the city police department had a misunderstanding, right?" Plaintiff responded:  "Yes, I mean we all did.  It was the crowd. It was just me being in duress and not knowing why, I mean you know, there was a lot of variables that were just spiraled out of control beyond everybody's control."  (Id. at 62.)  When asked "you understand why they asked for an ID and why they..." Plaintiff responded:  "Oh, yes.  I mean in hindsight, like I said, none of that would have transpired if I had given the police officer my ID, but I just started having my moments for whatever reason, I don't know."  (Id. at 65-66.)

## **ANALYSIS**

The undersigned reads the Complaint as raising six claims: (1)  A Fourteenth Amendment claim of deliberate indifference to a serious medical need:  "denial of medical treatment on location while under duress and stress."  (Docket no. 2 at 1.) (2 & 3)  Two Fourth Amendment claims: "unlawful detainment and

unlawful search and seizure...excessive force."(<u>Id</u>.)

(4) A First Amendment claim: "denial of 1st Amendment...right to freely assemble." (<u>Id</u>.)

(5) A State common law claim of negligent provision of police protection: "Failure to maintain crowd control" and "failure to demonstrate proper training while dealing with uncontrollable crowd and heart attack patient." (<u>Id</u>.)

(6) A State common law claim of defamation: "spreading hearsay instead of conducting proper investigation to set the factual events." (<u>Id</u>.)

## **Fourteenth Amendment Claim of Deliberate Indifference to Serious Medical Need**

During her arrest and booking process, Plaintiff was an arrestee. The burden of demonstrating deliberate indifference to a serious medical need by law enforcement officers and healthcare providers in a custodial setting is very heavy, even for an arrestee. The standard is set forth in <u>Donlan v. Smith</u>, 662 F.Supp. 352, 361 (D. Md. 1986), a case involving an arrestee:

> In <u>Estelle v. Gamble</u>, 429 U. S. 97, 97 S. Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that to prevail under a § 1983 claim for inadequate or improper medical care, a prisoner must allege and prove acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. <u>Id</u>. at 104-05, 97 S. Ct. at 291.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to

11

shock the conscience or to be intolerable to fundamental fairness."
<u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990); <u>see also</u>
<u>Rogers v. Evans</u>, 792 F.2d 1052, 1058 (11th Cir. 1986) (collecting
cases). "Serious medical needs" are those which have been
diagnosed by a physician as mandating treatment or that are so
obvious that even a lay person would easily recognize the necessity
for a doctor's attention. <u>Gaudreault v. Munic. of Salem, Mass.</u>,
923 F.2d 203, 208 (1st Cir. 1990).

> Deliberate indifference may be demonstrated by either
> actual intent or reckless disregard. <u>See</u> <u>Benson v. Cady</u>,
> 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts
> recklessly by disregarding a substantial risk of danger
> that is either known to the defendant or which would be
> apparent to a reasonable person in the defendant's
> position. <u>See</u> <u>id.</u> Nevertheless, mere negligence or
> malpractice does not violate the Eighth Amendment. <u>See</u>
> <u>Estelle</u>, 429 U.S. at 106.

Plaintiff's complaint asserts a Fourteenth Amendment claim via
42 U.S.C. § 1983 of deliberate indifference to her serious medical
need ["denial of medical treatment on location while under duress
and stress" (docket no. 2 at 1).] Plaintiff argues that her
preexisting SVT condition "rendered [her], somewhat incoherent" and
caused her to appear "to be inebriated." (Docket no. 62 at 3.) She
asserts that due to this medical condition she "needed an ambulance
on site; instead, I was taken to the police station." (Docket no.
62 at 4.)

The CPD argues that Plaintiff's own account of the facts shows
that CPD was not indifferent to any serious medical need. CPD

asserts that Plaintiff "failed to offer any evidence of either element, i.e. any deliberate indifference or any serious medical need." (Docket no. 64 at 4.)

The court finds this complaint is resolved in Plaintiff's sworn testimony of November 3, 2008 (docket no. 56-2). Plaintiff testified that Detective Eggleston called an ambulance for her from the scene (docket no. 56-2 at 54) and that when the ambulance got to the police station, she was asked if she wanted to go to the hospital and that she responded "no." (<u>Id</u>.) Regarding Detective Eggleston, she further testified:

> Q. You think he was legitimately concerned for your health?
> A. Yes. I think he was legitimately concerned...

(Docket no. 56-2 at 46) and later she testified:

> A. He was concerned about my well-being. He knew -- he called me the ambulance when I told him I was having a heart problem...

(Docket no. 56-2 at 62.)

Taking all of Plaintiff's statements as true, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has failed to demonstrate that CPD engaged in conduct that would constitute deliberate indifference to a serious medical need, sufficient to support an Fourteenth Amendment claim cognizable under 42 U.S.C. § 1983, and that CPD is entitled to judgment as a matter of law.

13

**Fourth Amendment Claims of (1) Unlawful Detainment, Search and Seizure and (2) Excessive Force**

Allegations of false arrest and excessive force during an arrest are governed by the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 394 (1989). It is well-settled that an officer may detain or arrest someone, without violating the Fourth Amendment, where the officer "has probable cause to believe that an individual has committed even a very minor criminal offense in his presence . . . ." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). The right to make an arrest carries with it the right to use an amount of force that a reasonable officer would think necessary to take the person being arrested into custody. Martin v. Gentile, 849 F.2d 863, 869 (4th Cir. 1988).

Further, there is clearly-established precedent first articulated in Terry v. Ohio, 392 U.S. 1 (1968), which held that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Although reasonable suspicion is a lower standard than probable cause, "the Fourth Amendment requires at least a minimal level of objective justification of making the stop." Id. (citing United States v. Sokolow, 490 U.S. 1 (1989)). In essence, the officer must be able to articulate more than a "hunch" about criminal activity. Id. at 124.

14

Additionally, it is well-settled that a law enforcement officer may handcuff a suspect when 'reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop.'" Young v. Prince Georges County, Maryland, 355 F.3d 751 (4th Cir. 2004), citing United States v. Crittendon, 883 F.2d 326 (4th Cir. 1989).

In determining whether a use of force is reasonable, the court should take into account the specific facts and circumstances of the case paying particular attention to: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers and others; and (3) whether the suspect is resisting arrest or fleeing. Graham, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly-evolving – about the amount of force that is necessary in a particular situation." Id.

Excessive force claims of pre-trial detainees are governed by the Due Process Clause of the Fourteenth Amendment. See Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir. 1997). A pre-trial detainee cannot prevail on a Fourteenth Amendment excessive force claim if her injury is de minimus. Id. The Fourth Circuit further explained the appropriate standard in Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998):

15

To succeed on a claim of excessive force under the Due Process Clause of the Fourteenth Amendment, [a plaintiff] must show that Defendants "inflicted unnecessary and wanton pain and suffering." *Whitley v. Albers*, 475 U.S. 312, 320, 106 S. Ct. 1078, 89 L. Ed.2d 251 (1986).  The proper inquiry is whether the force applied was "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 320-21, 106 S. Ct. 1078 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

Plaintiff's asserts two Fourth Amendment claims ["unlawful detainment and unlawful search and seizure...excessive force" (docket no. 2 at 1).]  Plaintiff asserts that CPD made her "arrest in a wanton or reckless manner."  (Docket no. 62 at 2.)

The CPD argues that Plaintiff committed several arrestable offenses and that Plaintiff

does not dispute that Detective Eggleston had an articulable suspicion that she had just committed a trespass.  Thus, Eggleston was allowed to stop her and perform a brief investigation consistent with the Fourth Amendment.  When, during the course of that investigation of a breach of the safety and security of the Vice-President, she decided to simply run away, Eggleston had probable cause to follow her and arrest her.

(Docket no. 57 at 17.)

Plaintiff admitted that her Fourth Amendment claims of "unlawful detainment and unlawful search and seizure" are without merit in her sworn testimony of November 3, 2008:

Q.  But you don't necessarily believe you were even harassed, you understand why they asked for an ID and why they----
A.  Oh, yes.  I mean in hindsight, like I said, none of that would have transpired if I had given the police officer my ID, but I just started having my moments for whatever reason, I don't know.

16

(Docket no. 56-2 at 65-66.)

Plaintiff stated that after refusing to give Detective Eggleston her ID, she walked away, and Detective Eggleston followed her:

> A.   Yes, Detective Eggleston just politely followed me. He wasn't being obnoxious or anything like that.  He wasn't.  He was, you know, just seemed like, can I see your ID, you know.  I can't let you leave until -- he wasn't irate or being boisterous or nothing like that.
> Q.   So he followed you across the street and he's still asking you for your ID and you're walking away and you won't give it to him, then what happens next?
> A.   Like I said, the crowd began to collect.
> Q.   Okay, They what happened?
> A.   And they began shouting.
> Q.   Okay.
> A.   And I proceeded to run.

(Docket no. 56-2 at 39.)

Her Fourth Amendment claim for excessive force is also without merit.  Plaintiff was stopped and handcuffed after running away from the police, who were investigating an intruder into a reception for the Vice President. When asked during her sworn testimony if she was hurt in anyway when she was handcuffed, she responded "no." (Docket no. 56-2 at 41 and 46.) She states that the booking officer treated her with "a very strong hand." (Docket no. 56-2 at 52.)  However, she admits that during the booking she was resistant and that her behavior was such that warranted her making an apology to the police.  (Docket no. 56-2 at 52-53.) She also stated that the booking officer did not physically harm her but rather "[h]e wasn't concerned for me."  (Docket no. 56-2 at 54.)

17

Based upon the evidence of record concerning the conduct of Plaintiff and CPD, CPD Officer Eggleston had a reasonable, articulable suspicion that criminal activity was afoot, and that once Plaintiff fled from Eggleston, he was justified in initiating an investigatory stop of Plaintiff, and in arresting her. The search of Plaintiff's purse was reasonable under the circumstances, as a matter of officer safety and the safety of the former Vice President of the United States. Plaintiff has failed to state a claim of excessive force. Taking all of Plaintiff's statements as true, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has failed to demonstrate that CPD engaged in conduct that would support a Fourth Amendment claim cognizable under 42 U.S.C. § 1983, and that CPD is entitled to judgment as a matter of law.

### First Amendment Claim of Right to Freely Assemble

"The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances." Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463 (1979). Moreover, the Supreme Court has consistently held that the First Amendment protects verbal criticism, challenges, and even profanity directed at police. See City of Houston v. Hill, 482 U.S. 451, 461 (1987).

Plaintiff's complaint of a First Amendment claim is: "denial

18

of 1st Amendment...right to freely assemble" (docket no. 2 at 1).
Plaintiff does not provide elaboration as to which specific rights
protected by the First Amendment she believes were violated, nor
does she provide details as to particular conduct related to this
claim.

    The CPD argues that

> no agent of the City of Charleston ever restrained
> Wilkerson's right to freely assemble until such time as
> she was arrestable.  Detective Eggleston approached Ms.
> Wilkerson within the boundaries of a *Terry* stop.  Had she
> complied with his simple request for identification, the
> incident would have been over....  At no point has
> Wilkerson suggested that the City's conduct in
> approaching and arresting her was other than content
> neutral... Indeed, Wilkerson has never said that
> Detective Eggleson had any idea *what* her viewpoints even
> were.  Ms. Wilkerson was arrested for her conduct, not
> her beliefs.  Accordingly, Defendant is entitled to
> judgment as a matter of law on this claim.

(Docket no. 57 at 19-20.)

    When asked at her deposition, "what brought you to The Grill
that day?"  Plaintiff responded "Killing time."  (Docket no. 56-2
at 15.)  Plaintiff indicated that she did not go The Grill with
anyone and did not go there to protest (docket no. 56-2 at 15, 18).

    Taking all of Plaintiff's statements as true, the undersigned
proposes that the presiding District Judge **FIND** that Plaintiff has
failed to demonstrate that CPD engaged in conduct that inhibited
Plaintiff's First Amendment right to freely assemble, and that CPD
is entitled to judgment as a matter of law.

## SUPPLEMENTAL JURISDICTION

Under 28 U.S.C. § 1367(c)(3), a court has discretion to decline the exercise of supplemental jurisdiction over state law claims if it has previously "dismissed all claims over which it has original jurisdiction."  Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity and considerations of judicial economy.  Cf. Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

In United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), which predated the enactment of section 1367, the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  The Supreme Court further noted that "[c]ertainly if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." Id. Our court of appeals has read Gibbs as recognizing "the desirability of having state courts interpret questions of state law" and also noted that "the federal interests supporting federal resolution of pendent state claims recede when the federal questions are dismissed." Mitcheson v. Harris, 955 F.2d 235, 238 (4th Cir.1992); see also Hinson v. Norwest Fin. S.C., Inc., 239

F.3d 611, 617 (4th Cir.2001) ("under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case or, in cases removed from state court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met.").

The only federal claims upon which jurisdiction was based have been dismissed. Further, the remaining state law claims are not related to any issues of federal policy. For these reasons and others, the undersigned proposes that the presiding District Judge decline to exercise supplemental jurisdiction over the remaining state law claims. See Person v. Wal-Mart Stores Inc., 65 F. Supp.2d 361, 364-65 (E.D.N.C. 1999) (declining to exercise pendent jurisdiction over plaintiff's state law claim for termination in violation of public policy after granting summary judgment on plaintiff's ADA claim). Nonetheless, the undersigned will provide a brief analysis of each state claim, if the presiding District Judge chooses to address them.

**Common Law Claim of Duty to Provide Police Protection**

Generally, a governmental entity's duty in the context of an alleged failure to provide any, or sufficient, police protection to a particular individual is defined at common law by the "public duty doctrine." Randall v. Fairmont City Police Department, 186 W. Va. 336, 412 S.E.2d 737 (1991).

Plaintiff asserts a common law claim of duty to provide police protection ["Failure to maintain crowd control" and "failure to demonstrate proper training while dealing with uncontrollable crowd and heart attack patient" (docket no. 2 at 1)].  Plaintiff asserts that she had a "fear of the crowd" (docket no. 62 at 5).

The CPD argues that Plaintiff testified that Detective Eggleston did all he could possibly do to control the crowd.  Also, at no time did Plaintiff assert that she suffered injury at the hands of the crowd.  (Docket no. 57 at 14.)

The court finds that Plaintiff's common law claim of negligent provision of police protection is resolved in her sworn testimony of November 3, 2008:

> Q.  And you can understand why the city police department had a misunderstanding, right?
> A.  Yes, I mean we all did.  It was the crowd.  It was just me being in duress and not knowing why, I mean you know, there was a lot of variables that were just spiraled out of control beyond everybody's control.
> Q.  And at this point, if you understand that there was a misunderstanding, the crowd was out of control and there were lots of variables that you couldn't control and the police couldn't control, why are you suing the police department?
> A.  Because I think they should -- I think they are paid to know, you know.  I think them saying before they had thoroughly investigated something to the media, you know, is the reason my character got defamed.  They should have conducted a thorough investigation before anyone spoke to the media, because the way the media is so -- I don't know how to describe the media.  And that's why I say I don't -- my issue is not with the City of Charleston Police Department, my issue is about the way they handled it, you know.  I think they should have dispersed the crowd.  I think it was the root cause of most of our problems.  The crowd should have been dispersed.
> Q.  They tried to disperse the crowd, didn't they?

A.    No, he was out manned, out numbered.
Q.    He couldn't do anything about it?
A.    No.  I mean he handled it as best he could until
backup came and then I don't think it was malicious that
he said to me, I think him and the FBI agent at the time
thought that a concealed weapon was a boxcutter in West
Virginia, you know, but at the same time, they're paid to
know.  And because they made that mistake and the media,
you know, got hold of it, it ended up, you know,
misrepresenting me to the public.  That's my issue.
Q.  So your issue is not as much as what happened at the
scene and your arrest, it's more how you were betrayed
(sic; portrayed) after they released you --
A.    Right.

(Docket no. 56-2 at 62-64.)

Plaintiff admitted that after she refused to provide her
identification to Detective Eggleston, she panicked and ran from
him.  She testified that she had a preexisting heart condition
called superventricular tachycardia ("SVT"), which causes an
accelerated heart rate.  (Docket no. 56-2 at 41-42.)  Her testimony
shows that she was aware of her heart condition, yet chose to run
from the police.  Plaintiff has not demonstrated that CPD was
negligent in its control of the crowd or lacked training in such
matters or that this contributed in any way to her choice to
withhold her identification and run from the police.

**Common Law Claim of Defamation**

The Supreme Court of Appeals of West Virginia has established
that a plaintiff must meet the following elements to successfully
assert a claim of defamation by a private individual: (1)
defamatory statements; (2) a nonprivileged communication to a third
party; (3) falsity; (4) reference to the plaintiff; (5) at least

23

negligence on the part of the publisher; and (6) resulting injury. See Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, 77 (W. Va. 1983). A "defamatory statement" is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Id.

Furthermore, Article III, § 8 of the West Virginia Constitution provides that in "civil suits for libel [or slander], the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous [or slanderous] is true, and was published with good motives, and for justifiable ends, the verdict shall be for the defendant." Thus, truth is a complete defense to a claim of defamation.

Plaintiff's final complaint is a State common law claim of defamation ["spreading hearsay instead of conducting proper investigation to set the factual events"(docket no. 2 at 1)]. Plaintiff asserts that the

> Charleston Chief of Police stated to the media that I was a would be assassin for the Vice President of the U.S... I was not there when the Chief of Police spoke to the Associated Press so I don't think anyone can say with 100% certainty that what the Associated Press reported the Chief of Police was saying is true, except the Chief of Police. But, it is still a material fact that the Press said he did. Is it unfortunate if it is not what he said? Yeah. But no one came forth to demand that the story be retracted, and an apology given to me... I received my official letter of apology December 20, 2008. See Document #3. If Charleston Police Department does not feel that they are guilty of doing anything wrong on October 18, 2004, then, what are they apologizing for?

24

> An apology is an admission of guilt, and also a material
> fact that they abridged my constitutional rights on
> October 18, 2004.

(Docket no. 62 at 4.)

The CPD argues that Plaintiff's complaint was filed on October 11, 2006.  The alleged defamation occurred on October 18, 2004. Under *W. Va. Code* §55-2-12(c), defamation claims must be made within a one-year statute of limitations.  Plaintiff does not allege that CPD engaged in any defamatory conduct after October 11, 2005.

Furthermore, CPD argues that Plaintiff has not placed in reasonable dispute that CPD made a false statement about her. (Docket no. 57 at 22.)  In her sworn testimony of November 3, 2008, she admits that the statements made by Detective Eggleston were true and that the press distorted them:  "I was on the scene with the box cutter" and that "the box cutter was found after I got to the police station."  (Docket no. 56-2 at 66.)   CPD states that

> It is undisputed that these statements are both true.
> Wilkerson read in the press that the chief of police made
> statements, some of which she disagrees with.  But she
> cannot testify that the chief of police actually made any
> such statements, and she admits that as far as she knows,
> the chief of police made only true statements to the
> press, who then misquoted him.  Such a speculative
> allegation, unsupported by anything else, is insufficient
> to show that the City made any false statements about
> Plaintiff.

(Docket no. 57 at 22.)

CPD responds that Plaintiff's claim that an apology constitutes an admission is wrong as a matter of law:

25

Wilkerson at one time suggested that she was amenable to compromise of her claims if she were to receive an apology.  Thus, the City, by counsel, sent Ms. Wilkerson an apology for any trouble that she might have experienced.  The letter contained an express notation that it was being transmitted for that purpose, consistent with Fed. R. Evid. 408.  Wilkerson rejected the apology, however, and refused to dismiss her claims... Wilkerson seeks to offer an offer to compromise by way of her sought-after apology as evidence to prove liability for a claim.  This is squarely what Rule 408 forbids.

(Docket no. 64 at 7-8.)

## <u>LATE CLAIM</u>

Plaintiff's Response to CPD's Motion asserts, for the first time, that she was arrested because she is African-American and that CPD engaged in "racial profiling."  CPD states that Plaintiff identified no evidence to support her allegation. (Docket no. 64 at 8.)  The undersigned proposes that the presiding District Judge find that this new  allegation of "racial profiling" cannot be raised at this date.

## <u>CONCLUSION</u>

The CPD has shown that there is no genuine issue as to any material fact.  Therefore, the burden shifted to Plaintiff to set forth specific facts showing that there is a genuine issue of material fact for trial of her federal claims.  Fed. R. Civ. P. 56(e).  To meet that burden, Plaintiff may not rest upon mere allegations or denials, but must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there

26

is a genuine issue for trial.  The undersigned reiterates that Plaintiff was provided a _Roseboro_ notice and despite this, failed to provide evidence on which a jury could rely to rule in her favor.  Therefore, summary judgment is appropriate for CPD. Plaintiff has not demonstrated any violation of her constitutional rights.  Therefore, based upon the undisputed facts, the undersigned proposes that the presiding District Judge **FIND** that defendant CPD is entitled to judgment as a matter of law on Plaintiff's § 1983 claims.

<u>**RECOMMENDATION**</u>

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** CPD's Motion for Summary Judgment (docket no. 56), and decline supplemental jurisdiction over her state law claims.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have ten days (filing of objections) and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of this Proposed Findings and Recommendation to which

objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to the plaintiff and counsel of record.

   May 7, 2009   
          Date

*Mary E. Stanley*

Mary E. Stanley
United States Magistrate Judge